## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPAR PUMICE COMPANY, INC., and )
KELLY ARMSTRONG, )
             **Plaintiffs,** )
        **vs.** )   **No. 12-894L**
 )
THE UNITED STATES OF AMERICA, )
            **Defendant.** )
 )

## PLAINTIFFS' RESPONSE TO MOTION TO DISMISS COMPLAINT

Plaintiffs respectfully submit this response to the United States' (government) motion to dismiss.

### Factual Background

In its factual background, the government broadly sweeps aside all of Plaintiffs' claims asserting that they are time-barred and stale. The government asserts that the plaintiffs have been long aware of the Forest Service's interpretation of its regulations and that all that the Forest Service's regulatory enforcement actions are consistent with the April 4, 2002, settlement agreement in *Richard P. Cook, et al., and Copar Pumice Co. v. The United States* (U.S. Court of Federal Claims No. 94-344L) (hereafter 2002 Settlement Agreement) (*Complaint*, Ex. 1). In fact, none of this is true. Plaintiffs' claims are based upon *recent* conduct of the Forest Service which seeks to deprive Plaintiffs of all their benefits under the Agreement, including recent regulatory enforcement action. The Forest Service has not consistently interpreted its regulations, and the contrary is true. None of Plaintiffs' claims accrued prior to 2009; none are barred *res judicata* or collected estoppel.

Plaintiffs will respond to the government's recitation of the factual background as appropriate in the argument below. However, we do have several preliminary comments. The government's recitation of the Forest Service Enforcement Actions (*Motion*, pp. 9-10) is

manifestly incomplete and overlooks subsequent developments by which the Forest Service specifically authorized the disposal of the waste pumice and materials which were not suitable for use in the laundry industry.  This issue was raised and resolved by virtue of the 2006 Notice of Noncompliance (2006 NON) by which Forest Service stated that Copar operations were being conducted in compliance with its regulations and by which the removal of 3/4"+ of pumice from the Mine was authorized by the Forest Service.  A copy of the 2006 NON is attached as Exhibit 1.  Copar appealed to the 2006 NON.  (Ex. 2).  A copy of the May 2006 letter resolving the noncompliance is attached as Exhibit 3.

The government also overstates the effect of the *Copar Pumice Co. v. Bosworth,* 502 F. Supp. 2d 1200 (D.N.M 2007) and *Copar Pumice Co. v. Tidwell*, 603 F.3d 780 (10th Cir. 2010). *Bosworth* and *Tidwell* both involved an administrative appeal of the notice of noncompliance issued by the Forest Service in 2003.  Neither case involved the substantive taking, breach of contract, misrepresentation or the unjust enrichment claim at issue here, or the resolution of the 2006 NON.  Indeed, the government previously argued that Copar Pumice Company, Inc.' (Copar) claims previously raised in *Cook* v. *United States*, 85 Fed. Ct. 820 (2009), *aff'd,* 368 F. App'x 143 (Fed. Cir. 2010), were barred by *Bosworth* and this Court rejected that contention.  *Id.* 85 Fed. Ct. at 824, tr. 4:

> We decline to adopt the government's position that the district court's decision in Bosworth bars Plaintiffs' claims in this action.  In Bosworth, the court affirmed the Forest Service's issuance of a NON as neither arbitrary nor capricious.  In this action, however, Plaintiffs charge that post-Bosworth government actions violate the 2002 Settlement Agreement.  That issue was not addressed in Bosworth.

The government also mischaracterizes the plaintiffs' 2008 proceeding brought in this Court as a new "second case." (*Motion*, p. 11).  In fact, that proceeding originated as a "motion to enforce settlement agreement and for damages," filed in *Cook I*, Fed Claims Court Cause No. 94-344 (*See Motion to Enforce, attached to Motion to Dismiss* as Ex. 11).  Plaintiffs simply

sought to reopen the case to enforce the settlement agreement. *Id.* By *Order* dated May 6, 2008, this Court chose to treat the motion as a complaint because "the files have been archived," but without prejudice to Plaintiffs' rights to argue that the court retained jurisdiction to enforce the agreement. *See Order* filed 5/6/2008 in Fed. Cl. Cause No. 08-337L. No actual complaint or answer was ever filed.

The government also substantially ignores the significance of its latest complaint (the trespass complaint") filed in the District Court of New Mexico against Copar, Kelly Armstrong, Richard P. Cook, Shirley A. Cook and Debbie Cantrup  The trespass complaint seeks $8 million in damages for the allegedly unlawful trespass and removal of 3/4"+ pumice from the claims based upon the theory that the government owns the minerals. *U.S. v. Copar Pumice Co.*, D.C. No. 1:09-CV-01201; *see Motion*, p.12, Ex. 11. The trespass complaint is also plainly based upon the 2002 Settlement Agreement and alleges that Copar violated the Agreement. *See Amended Complaint*, ¶¶ 26, 42, 46, 50, 57. The Amended Complaint alleges that the defendants were prohibited by the JNRA and the 2002 Settlement Agreement from removing and disposing of common variety minerals which formed the basis of their trespass and conversion claims. *Amended Complaint*, ¶¶ 50, 57. It alleged that the individual defendants failed to ensure that their lessee (Copar) complied with the Settlement Agreement, which failure violated their duty to the government. *Amended Complaint* ¶¶ 42, 45-46. However, the government now insists that its trespass complaint does *not* involve any contract claims, presumably because of paragraph four of the agreement provides this court with jurisdiction over such claims and cases routinely hold the Court of Federal claims has exlusive jurisdiction over contract claims. *See Union Pacific National Co. v. U.S.,* 591 F3d 1311, 1320 (10th Cir. 2010) (holding that exclusive jurisdiction over negligent breach of contract claim was in Court of Federal Claims); and *See*

*Mem. Op. and Order*, 8/22/13, Ex. 4 hereto.   In this regard, paragraph four (4) of the 2002

Settlement Agreement provides as follows:

> Plaintiffs and Defendant submit themselves to the continuing jurisdiction of the
> United States Court of Federal Claims, subject to applicable law, in the even, and
> for the sole purpose, of any proceedings to enforce this agreement.

*See Complaint*, Ex. 1.

The conduct taken by the government in the trespass complaint effectively confiscates

Plaintiffs' mining claims.   It effectively prohibits mining.   Pumice mining, including screening,

transportation, processing and washing, inevitably creates large amounts of waste.   By definition,

the waste is not suitable for disposition in the laundry industry, yet the government charges

Copar with conversion and trespass of those waste materials.   The Forest Service has *never* taken

such an extreme and draconian position as that advanced in the trespass complaint filed in *U.S. v.*

*Copar* cause No. 1:09-CV-01201 which constitutes a *de facto* taking of private property.

### I.A.    <u>Plaintiffs' claims are not barred by the statute of limitations</u>.

The government first argues that all of Plaintiffs' claims are barred by the six year statute

of limitations set forth in 28 U.S.C. § 2501.   (*Motion*, p. 17).   That provision bars claims which

accrued more than six years prior to the filing of a complaint.   As the government recites, a

takings claim accrues when *all* of the events which fix the government's liability have occurred.

*McDonald v. U.S.*, 37 Fed. Cl. 110, 114 (1997), aff'd, 135 F.3d 778 (Fed. Cir. 1998)

(unpublished table decision).

In this case, the Plaintiffs seek compensation under the Fifth Amendment for the

government's taking of mineral rights without just compensation.   Compensable takings include

physical taking of private property and regulatory taking "in which the government regulations

unduly burden private property to the point of diminishing its value."   *See Placer Mining Co.,*

*Inc. v. U.S.*. 98 Fed Cl. 681, 684 (2011).   This case involves both physical taking of private

property and a regulatory taking, as the plaintiffs have been denied any economically beneficial use of the pumice at issue. *See Bass Enterprises Production Co. v. U.S.*, 381 F.3d 1360, 1365 (C.A. Fed. 2004); *Pennsylvania Production Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158 (1922).

The Amended Complaint alleges a permanent and a temporary taking of the plaintiffs' property.  The two forms of taking are different for claim accrual purposes. A permanent takings claim accrues when all events which fix the government's liability have occurred, and the plaintiff is aware of their existence. *See Hopland*, 855 F.2d at 1577. By contrast, a temporary takings claim accrues when "the regulatory [or other] process that began it has ended" because, among other things, the property owner "would not know the extent of their damages until the Government completes the 'temporary' taking." *Creppel*, 41 F.3d at 632. Only when "'all events occurred to fix the alleged liability of the Government" would the temporary takings claim accrue. Id. at 631; see also *Independence Park Apartments v. United States*, 61 Fed.Cl. 692, 709 (2004) (citing *Creppel* in holding that "[t]he end of the temporary taking establishes the date when the statute of limitations begins to run on the takings claim").

The government's limitations argument is easily disposed of based upon the government's own admissions in the trespass case, *U.S. v. Copar*, 1:09-CV-01201.  In that case, the government filed a complaint against Copar in December 2009 for trespass and conversion. (*Motion to Dismiss*, Ex. 11).  Copar responded by filing a *motion to dismiss* based upon the compulsory counterclaim rule.  Copar argued that the government's trespass and conversion claims *could* have been brought in the earlier *Bosworth* case, *Copar v. Bosworth*, 502 F. Supp. 2d 1200 (D.N.M. 2007).  In its response, the government argued that its trespass and conversion claims had not ripened or matured as of 2006, because the *Notice of Indebtedness* setting forth the $8,743,416 owed did not issue until June 16, 2009.  (Ex. 5, pp. 13-14).  The government

admitted that its $8.7 million trespass and conversion claims against Copar did not mature until the June 2009 *Notice* was issued as follows:

> Here, the United States' claims are based on an agency action for the administrative collection of a debt against the government--the June 16, 2009 issuance of a Notice of Indebtedness and bill to Copar and Armstrong by the Forest Service's ASC Claims Branch--that occurred long after the answer was filed in *Bosworth* on April 3, 2006 (Ex. 2, *Bosworth* Civil Docket Sheet, at Dkt. #9) and the motion to dismiss was filed in *Cook II* on August 26, 2008 (Ex. 3, *Cook II* Civil Docket Sheet, at Dkt. #7).  Much like the claim for rents and royalties in *Arch Minerals* was not a compulsory counterclaim even though MMS initiated an audit for collection of rents and royalties and communicated preliminary dollar amounts owed by Ark before a compulsory counterclaim would have been filed in *Ark II*, **the United States' claim for damages was not mature until at least the Notice of Indebtedness was issued**, detailing the extent to which Defendants had violated the law and caused damage to the United States.

*U.S. Response to Motion to Dismiss*, Ex. 5, hereto pp. 13-14).

Copar's takings, contract and related claims against the government here did not accrue prior to the time the Forest Service issued $8.7 million *Notice of Indebtedness* in June, 2009 for similar reasons.  A copy of the *Notice of Indebtedness* is attached as Ex. 6.  Prior to that time, the Forest Service had not claimed an ownership interest in all the 3/4"+ pumice removed from the Mine or interpreted and applied its regulations in a fashion which denied Copar any and all economical use of the mining claims.  The Forest Service had never indicated to Copar (or others) that enormous regulatory trespass damages, based upon its alleged ownership of the minerals, were accruing on a daily basis.  To the contrary, while Copar and the Forest Service had a dispute in 2006 over the removal of undersized 3/4"+ pumice pursuant to the 2002 Settlement Agreement, the parties had reached a resolution of that dispute in July, 2006.  (Exs. 1-3).  During those negotiations, the Forest Service never advanced its ownership claim.  It said nothing concerning its ownership of the minerals or any alleged trespass or coercion until it sent the *2009 Notice* setting forth the $8.7 million dollar due.  For the first time, the *2009 Notice*

divulged the government's ownership claim of the minerals and the economic impact of the Forest Service's alleged ownership, an impact which exceeds the gross revenues of the mine. No mine could possibly economically operate under these circumstances.

The government then argues that Plaintiffs' regulatory taking claim accrued when the regulations became effective on January 16, 1991. (*Motion*, p. 17). This assertion fails because none of the events had yet occurred as the conduct giving rise to the takings had not occurred. As set forth above, the conduct comprising and perfecting the regulatory taking did not occur until June, 2009.

The government next contends that Plaintiffs were give ample notice of the Forest Service's interpretation of 36 C.F.R. subpart C regulations starting in 1998 and again in 2002 and 2003, and, in particular, of the Forest Service's interpretation of the regulations to require that all of the pumice removed from the El Cajete Pumice Mine (the Mine) had to be sold to the stonewash laundry industry, and could not be disposed of elsewhere. (*Motion*, p. 18.) This is not true. The Forest Service never previously stated that it owned all of the minerals at issue or interpreted its regulations so that Copar had trespassed and converted all pumice removed from the claims which was not actually used in the stonewash laundry industry.

To the contrary, the Forest Service advanced divergent interpretations of the regulations at issue, including its latest confiscatory interpretation, and did not consistently require that all pumice removed from the Mine be used in the stonewash laundry industry. By way of background, Copar operated the Mine upon the Brown Placer Mining Claims pursuant to an approved Plan of Operations. The Forest Service approved mining of approximately 87 acres for a period of ten years from November 1997 through November 19, 2007. Mining of all the

approved acreage was not completed by November 2007.  Approximately 15 acres remain to be mined.  The deposit contained substantial amounts of 3/4"+ pumice and 2"+ block pumice.

In 1997, opponents to the Mine, including the Sierra Club, objected to and appealed the EIS and Plan of Operations. One of the issues raised in the appeals was the end-use of pumice because nothing in the Plan of Operations restricted the use of the 3/4"+ pumice to the laundry industry.  The Forest Service admits that the Plain contains no such restrictions, both then and now.  (Tafoya Dep., p. 90 "there was not anything specifically written into the plan.") (Ex. 7). Nothing in the Plan of Operations required the tracking of use of the pumice, either. (Tafoya Dep., p. 90, "I don't believe there is").  In fact, Copar is the very first company which has ever been requested to account for the end-use of an uncommon variety mineral.  (Tafoya Dep., p. 121).

One of the grounds of the Sierra Club's appeal was that all pumice removed from the Mine had to be used in the laundry industry.  The Forest Service rejected that appeal and determined that it lacked regulatory authority to control the end use of the pumice on at least four occasions.  For example, in 1998, after the El Cajete *Plan of Operations* was approved, Santa Fe Forest Service Supervisor Leonard Atencio wrote that ultimate destination of the pumice from the Mine did not matter, establishing that it did not have to be used in the laundry industry.  He wrote: "*[W]e do not believe that the destination itself 'changes' the pumice enroute from 'locatable' to 'non-locatable', making it an illegal act to have mined the pumice.*"  (Ex. 8).  Mr. Atencio's position is consistent with the official positions taken by the Forest Service when the Mine was approved, as follows:

**5//20/96- USFS Response to Sierra Club 4/18/96 letter** (Ex. 9)
"*The Forest Service has no control over the disposition of the pumice once it leaves the mine site.  As long as there is demand and willing buyers for the larger pumice fraction, for the garment-finishing industry, it doesn't make economic*

sense for the company to remove the pumice from the mine, crush it and the sell the pumice as aggregate when it can be sold to the garment finishing business at some four-times the value it would bring for aggregate or other common use."

**8/13/96 – Diane Tafoya's Memo to File – Notes from 7/16/96 meeting with SFNF & Sierra Club** (Ex. 10)
"*We explained that we have never tracked locatable material, and are not required to, since the material is obtained free under the mining laws.* We acknowledged that since the passage of the JNRA, it is appropriate to insure that common variety is not removed from the JNRA." "As the deposit is very consistent from place to place, size is the only value that denotes whether the pumice is locatable or is common variety, at the mine."

**12/10/96 – Forest Service Final Environmental Impact Statement for El Cajete Pumice Mine** (Ex. 11)
"*It is not necessary to insure that pumice mined in the Jemez Mountain National Recreation Area is marketed for the proper use*, but simply that common variety pumice does not leave the mine site." *See* Forest Service Comment 14, Pg. 85.

**4/27/98 – Letter from Forest Supervisor L.Atencio to D.Goad letter** (Ex. 8)
"*We do not agree that the Forest Service is responsible to 'track' the pumice for use or destination once it leaves Copar's ownership.* We believe that the *'locatability' can be determined as the material leaves the mine site.* This is the only feasible way to administer the operation…

"*[W]e do not believe that the destination itself 'changes' the pumice enroute from 'locatable' to 'non-locatable', making it an illegal act to have mined the pumice.*"

The Sierra Club and fourteen other parties filed appeals of the Record of Decision approving the EIS on various grounds, including that all of the pumice removed from the Mine had to be used in the laundry industry. On March 14, 1997, the Forest Serv14ice *rejected* the Sierra Club's appeal on this issue, resulting in a final administrative decision in *favor of Copar here*.[1] Consequently, there have been conflicting and contradictory interpretations of the regulations within the Forest Service itself, both generally and as applied to the Mine, with respect to the end-use of the pumice at issue.

---

[1] Most of the foregoing evidence was *not* considered as part of the administrative appeal in *Bosworth* and so, played no role in the administrative appeal which did not involve trespass or conversion claims, in any event.

The Forest Service has also specifically authorized the removal of pumice which could *not* be used in the stonewash laundry industry.  On February 6, 2006, the Forest Service issued a second NON to Copar which specifically addressed whether the removal of undersized pumice from the Mine – pumice which could not be sold into the laundry industry – complied with the 2002 Settlement Agreement.  (Ex. 1)  Copar appealed that NON. (Ex. 2).  The Forest Service and Copar resolved the NON at a meeting held on May 8, 2006, as documented in a May 16, 2006, letter from Forest Supervisor Zepeda.  (Ex. 3)  In that letter, Mr. Zepeda confirmed that Copar's mining operations were being conducted in accordance with the "Plan of Operations and Forest Service Regulations" and specifically authorized Copar to continue removal of stockpiles of the small pumice from the mine site, including undersized pumice, and did so without *any restrictions* placed on the *off-site use* of the pumice.  (*Id.*)  In his letter, Forest Supervisor Zepeda wrote Copar as follows:

> • The screening tests done in late April indicate that Copar's efforts to bring the screening operation into compliance with the Plan of Operations and Forest Service regulations have resulted in substantially less undersize pumice in the 'small product' stockpile.  **Therefore, the Notice of Noncompliance issued by the Santa Fe National Forest on February 6, 2006 has been resolved, and the small product stockpile (as produced by the screen plant operating as it was on April 27, 2006) may be removed from the site.**

(Ex. 3).

In addition, the Forest Service representatives regularly inspected the Mine on over 100 separate occasions from 2002 through November 2007 and approved Copar's ongoing, continuing mining operations. A Forest Service geologist, Mr. Gore, conducted most of these inspections and measured the amount of undersized pumice in the several stockpiles at the mine. He had conversations with Copar employees during these inspections, including the mine manager and supervisors, regarding assuring that an excessive amount of undersized pumice did

not leave the Mine.  (*See* Exs. 14-17).  In response, Copar took various steps in order to reduce the amount of undersized pumice removed. The Forest Service allowed Copar to continue to operate and remove pumice from the Mine during this entire period and did not inform any of the Copar representatives that the removed pumice could only be sold into the laundry industry or take any action to prevent such sales. (*Id.*)  Of course the Forest Service now claims under its regulatory activity that it was illegal to remove any pumice which was not actually sold in the laundry industry – effectively prohibiting all mining operations.

**Waste and waste pumice.**   The Forest Service has also advanced contradictory interpretations of the regulations with respect to the disposition of waste and waste pumice removed from the claims.  By way of background, the vast majority of the pumice removed from the Mine was shipped 23 miles from the claims to Copar's Española plant where it was screened, washed and processed for sale to the laundry industry.  Some undersized-3/4" common variety pumice adhered to and was invariably mixed with the three stockpiles of the larger 3/4"+ pumice.  In addition, the larger 3/4"+ pumice had to be processed, washed and cleaned for use in the laundry industry.  This resulted in substantial amounts of waste material which was not remotely suitable for use in the laundry industry, including additional undersized pumice.  This is the same pumice the Forest Service now mandates had to be sold into the laundry industry and that any other disposition was in breach of the 2002 Settlement Agreement.  The Forest Service mandate is patently unreasonable and again prohibits mining by rendering the disposition of waste illegal.

**2"+ Block Pumice.**  Finally, the mining claims contained substantial quantities of "block pumice" which is pumice larger than 2" in size along one dimension.  It is established that Copar could lawfully remove and sell the 2"+ "block pumice" outside of the laundry industry because

this block pumice was locatable as a matter of law under the Common Variety Act.  30 U.S.C. §

611 provides as follows:

> "Common varieties" as used in this subchapter and sections 601 and 603 of this
> title does not include deposits of such materials which are valuable because the
> deposit has some property giving it distinct and special value *and does not include
> so-called "block pumice" with occurs in nature in pieces having one dimension of
> two inches or more*.  (Emphasis added.)

Copar mined, excavated, removed, processed and sold substantial quantities of the 2"+

block pumice which was used for biofilter air pollution control equipment in facilities across the

country.  The Forest Service has effectively confiscated the block pumice.  The Forest Service's

mineral expert, Mike Linden, testified that the block pumice was "locatable under the law" and

that Copar could have lawfully removed and sold the 2" block pumice for any purpose which

required such a 2" dimension:

> Q.  And what's the consequence of pumice being in excess of two inches in
> diameter, if any?
> A.  Well, the 1955 Common Varieties Act identified pumice with a dimension of
> two inches or more as locatable, block pumice.
> Q.  What's the implication of that, what's that mean? . . .
> THE WITNESS:  We would consider it locatable under the law.
> Q.  Okay.  And it's locatable under the law, what is the implication of that?
> That's what I'm getting at.  What difference does that make?
> A.  That it could be removed from the mining claim under the 228, you know,
> Subpart A regulations for locatable minerals.
> Q.  Right.  And it can be removed and marketed and sold from the mining claim;
> is that correct?
> A.  Yes.  (Linden dep., pp. 34-35.) . . .
> Q.  Okay.  So in your view would the test be that, if the two-inch pumice was
> suitable for and used for a purpose that required that dimension, that would be an
> acceptable use of pumice?
> THE WITNESS:  Well, that's what our regulations say.  So tend to follow our
> regulations.
> Q.  So the answer would be yes?
> A.  Yes.  (Linden Dep., p. 39., Ex. 13)

The courts have also recognized that contractual property rights are recognizable property

interests protected under the Takings Clause of the Fifth Amendment.  *See Century Exploration*

*New Orleans v. U.S.*, 103 Fed. Cl. 70, 76 (2012); *Bass Enters. Prod. Co. v. U.S.* 45 Fed. Cl. 120, 122-23 (1999). Where the government is a party to the contract, a takings claim with respect to contractual rights may be stated where the government is acting in its sovereign capacity as opposed to its proprietary capacity. *See Century Exploration*, 103 Fed. Cl. at 78-81 (explaining that claims of a breach of contract and a taking may be brought concurrently and proceed until at least the contract claim becomes viable and trumps the taking claim.) Plaintiffs' contractual rights taking claim did not accrue until the *Notice of Indebtedness* was issued, as explained above.

**Plaintiffs breach of contract and misrepresentation claims are not barred by limitations.**

The government argues at pp. 19-21 of its motion that Plaintiffs' breach of contract and misrepresentation claims are barred by the statute of limitations, arguing that the cause of action accrued at the time of the breach of contract, which occurred when the first NON was issued in 2003. Plaintiffs' breach of contract and misrepresentation claims are not barred by the statute of limitations. The government misapprehends the basis of the breach of contract claim at issue and substantially ignores that the basis pertains to ownership of the 3/4"+ pumice at issue. The 2002 Settlement Agreement clearly provided that Copar was allowed to retain and keep the 3/4"+ pumice located in the mining claims, including the 2"+ block pumice. Paragraph three (3) of the 2002 Settlement Agreement provides: "Defendant agrees that Plaintiffs will retain Brown Placer Mining Claims Nos. 9-12 as unpatented mining claims subject to all pertinent statutes and regulations." *Complaint*, Ex. 1, p. 2. "Retain" is defined as "to keep in possession or use." *Merriann Webster's Collegiate Dictionary*, 10th ed., (1996) p. 999.

Copar claims that the government *never* claimed a right of possession or *ownership* interest in the 3/4"+ pumice removed from the claims prior to the time the June 2009 *Notice of Indebtedness* was issued to Copar. The government can point to *no* evidence of its claim of

alleged ownership of the 3/4"+ pumice removed from the claims prior to June 2009, simply because there is *none*. Consequently, under the government's own admissions, Copar's breach of contract and misrepresentation claims accrued no earlier than June 2009.

Plaintiffs' misrepresentation claims also did not accrue until June 2009, when the falsity of the various prior representations became apparent. Prior to June 2009, Copar was *not* on notice that the government claimed to own all of the 3/4"+ pumice that was removed from the claims. To the contrary, the government expressly, impliedly and repeatedly represented to Copar that it could freely remove and dispose of the 3/4"+ pumice from the claims and do so in compliance with the 2002 Settlement Agreement and Forest Service regulations. The 2/6/2006 *Notice of Noncompliance* stated that "the removal of common variety pumice from the Brown Placer Claims #9 through #12 is a violation of the Jemez National Recreation Area Act (16 USC 46jjj-2(b)) and the April 4, 2002, settlement agreement in *Richard P. Cook, et al. and Copar Pumice Co. v. The United States* (U.S. Court of Federal Claims No. 94-344L). (Complaint, Ex. 1). The 2006 NON was "resolved" by virtue of the May 16, 2006 letter from Forest Service Zepeda to Copar, when the Forest Service specifically authorized Copar to remove the small product stockpiles containing about 7.6% undersized pumice from the claims. (Ex. 3). Again, the falsity of Mr. Zepeda's May 2006 letter was not revealed until June 2009 when the U.S. issued the *Notice of Indebtedness*, which included the same undersized pumice Mr. Zepeda had previously authorized to be removed.

The undisputed testimony also fully demonstrates that the Forest Service failed to inform Copar that it interpreted the regulations such that it owned and was entitled to the value of common variety pumice until the *Notice of Indebtedness* was issued in June 2009, well after the mine closed, thus misleading Copar. The Forest Service did not disclose or state that it owned

14

and was entitled to the full value of the common variety pumice until sending the *Notice of Indebtedness* to Copar in 2009.  Mr. Gore testified as follows:

> Q.  What I'm getting at is the material could have been stockpiled outside of Forest property and stored for a period of time until sold into the laundry industry; isn't that right?
> MS. KEEGAN:  Object to form, foundation, calls for a legal conclusion.
> THE WITNESS:  Yes.
> BY MR. MANGES:
> Q.  And what the Forest Service was objecting to was the sale of the material for common variety purposes, not timing of the sale; is that right?
> A.  That is correct.
> Q.  And along those lines did you either orally or in writing inform Copar that the Forest Service would be seeking as damages the full sales value received for the pumice sold into the common variety purposes?
> A.  When we issued the Notice of Indebtedness, that was based upon the full value, yes.
> **Q.  Prior to the issuance of the Notice of Indebtedness, did either the Forest Service or you orally or in writing inform Copar that the Forest Service would be seeking the full value of the sales received for the common variety pumice sold?**
> **A.  I am not aware of any instance, no.**

(Gore Dep., at 196-98, Ex. 12).

### B.      Plaintiffs' claims are not barred under the JNRA.

The government argues that Plaintiffs' takings claims under the JNRA are barred by the one-year limitation period under the JNRA.  (*Motion*, p. 21).  The takings claims are not barred under the one-year provision because the plaintiffs' claims in *Cook I* were timely filed under the JNRA and  Plaintiffs' claims herein are based upon the 2002 Settlement Agreement which the government promised plaintiffs would retain the property and the mining claims.  The government readily concedes that *Cook I* was timely filed and that the plaintiffs were entitled to retain property under the Agreement.  (*Motion*, pp, 7-8).  The instant Complaint is based upon the government's conduct which is amounting to a confiscation of the property it promised to plaintiffs in Cause No. 94-344L.  As set forth above, the taking of the plaintiffs retained property under the Agreement by virtue of the government's conduct was not evident and had not

remotely disclosed until the notice of indebtedness was transmitted in June 2009, at the earliest. *See, e.g., Armijo v. U.S.*, 229 Ct. Cl. 34, 663 F.2d 90 (1981); *White Sands Ranchers of N.M. v. U.S.*, 14 Ct. Cl. 559 (1988).

**C & D.**        **The Court has jurisdiction over the misrepresentation and unjust enrichment claims.**

In points "C" and "D," the government asserts that the Court lacks subject matter jurisdiction over the misrepresentation claims because they sound in tort and are outside of this Court's jurisdiction.  (*Motion*, p. 22.)  The government also argues the Court lacks jurisdiction over the unjust enrichment claims.  (*Motion*, p. 23.)

This Court possesses jurisdiction over misrepresentation claims where the claims are closely related to a contract claim or arose from the contractual undertaking.  *L'Enfant Plaza Properties v. U.S.*, 227 Ct. Cl. 1, 645 F.2d 886, 892 (1981) (jurisdiction over trespass claims because claim related to 99 year lease); *Road and Highway Builders LLC v. U.S.*; *Hartle v. U.S.*, 18 C. Ct. 479 (1998); *Nematollahi v. U.S.*, 38 Fed. Cl. 224 (1997).

This Court has jurisdiction because the misrepresentation claims at issue because they pertain to the parties' rights under the 2002 Settlement Agreement and the parties' performance thereunder.  As explained above, the issuance, negotiation and resolution of the February 6, 2006, NON are based upon the 2002 Settlement Agreement.  In the February 6, 2006, NON, the Forest Service asserted that Copar breached the 2002 Settlement Agreement.[2]  (Ex. 1).  The Forest Service subsequently made representations concerning the meaning and interpretations of the Agreement which resulted in the May 16, 2006, resolution.  (Ex. 2).  Those representations made in the 2006 negotiations are false or misleading and form one of the basis of Copar's

---

[2] The Forest Service cannot deny that the 2006 NON itself was not based upon the 2002 Settlement Agreement, because the 2006 NON, by its very own terms, was explicitly based upon a dispute over the terms of the agreement. *See* Ex. 1.

complaint against the government here.  (*See*  Exs. 14-17) Copar removed pumice from the mine based upon the representations and resolution of the 2006 NON.

The Court has jurisdiction over the unjust enrichment claim.   The government preliminarily argues that the court lacks jurisdiction because the Amended Complaint was filed more than twenty-one (21) days after the complaint and therefore is untimely under Rule 15. *Motion*, p. 23.  RCFC Rule 15(a)(1)(B), like the Federal Rules of Civil Procedure, provides that a party may amend its pleadings once "as a matter of course" twenty-one (21) days after service of a responsive pleading or twenty-one (21) days after service of a motion under RCFC 12(b), (E) or (f).  The Amended Complaint was served on March 20, 2012.  No responsive pleading has been filed.  The government's motion to dismiss was not filed until April 8, 2013.  Therefore, the Amended Complaint was timely filed.  *See Albino v. U.S.*, 93 Fed. Cl. 405 (2010) (holding that an amended complaint filed within twenty-one (21) days of the government's motion of dismissal was timely filed and denied the government's motion to strike).

The government then contends that the unjust enrichment claim is just an "implied in law" claim which is outside of this Court's jurisdiction.   *Motion*, p. 23.  The government overlooks that there is a valid express contract in place – the 2002 Settlement Agreement – so the "implied in law" cases are inapposite.   The plaintiffs are seeking damages due to the government's breach (or outright repudiation) of the 2002 Settlement Agreement.   Those damages are property measured in the amount the government has been unjustly benefitted by its breach.  Such a measure of damages is plainly within this Court's jurisdiction.  *Mann v. U.S.*, 68 Fed. Cl. 666 (2005); *Landmark Land Co. Inc. v. FDIC*, 256 F.3d 1365, (C.A. Fed. 2001).  The government, by virtue of its breach of the 2002 Settlement Agreement, has kept substantial quantities of the larger 3/4+" pumice which Copar was otherwise entitled to excavate and sell,

and has been unjustly enriched thereby.  This Court plainly has jurisdiction over such a claim. (*Id.*)

### II. A & B. <u>Plaintiff's' claims are not barred under *res judicata* or collateral estoppel.</u>

The government argues that Plaintiffs' claims are barred by the doctrine of *res judicata* or collateral estoppel based upon the previous cases between some of the same parties.  (*Motion*, pp. 24-29.)  It is well-settled that the elements of *re judicata* are: "(1) a final judgment on the merits in a n earlier action; (2) the involvement of the same parties; and (3) an identity of the same issue or cause of action in both the earlier and later suits."  *Adams v. United States*, 51 Fed. Cl. 57, 59 (2001).

The government first argues that Plaintiffs' claims are barred by virtue of the *Joint Stipulation of Dismissal* entered in Cook I.  (*See Motion*, p. 25, Ex. 5.)  The government is mistaken.  The *Joint Stipulation of Dismissal* did not dismiss or adjudicate the claims arising out of the 2002 Settlement Agreement, but rather, incorporated the terms of the Settlement Agreement.  The *Joint Stipulation of Dismissal* actually provided as follows:

> Pursuant to Rule 41(a)(1)(ii) of the United States Court of Federal Claims, and under the terms of the Settlement Agreement entered into by the parties on April 4, 2002, the parties stipulate to the dismissal of this action with prejudice, each side to bear its own costs.

*Motion to Dismiss*, Ex. 5.

As indicated above, one of the terms of the 2002 Settlement Agreement was that the plaintiffs were entitled to retain the Brown Placer Mining Claim Nos. 9-12.  Consequently, the settlement in *Cook I* confirmed Plaintiffs' rights to *keep* the pumice at issue here, pumice the Forest Service has subsequently taken by virtue of its oppressive regulatory conduct.  Plaintiffs' taking claims at issue here had not yet arisen and were not adjudicated in 2002. *See, e.g., Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (no preclusive effect of prior judgment for

"claims which did not even then exist and which could not possibly have been sued upon in the previous case").

Moreover, new, additional and different issues and facts are presented in this case than were presented in either *Cook I and Cook II*. Those cases did not involve the Forest Service's claim it had an ownership interest in all of the 3/4"+ pumice removed from the claims or that Copar unlawfully converted or trespassed *all* pumice removed from the claims which was *not* sold to the stonewash laundry industry, including the waste pumice or 2"+ block pumice produced from the claim. Additionally, those cases did not involve the Forest Service's representations made from 2004 to 2006 or the resolution of the February 6, 2006, NON by which the Forest Service specifically authorized the removal of pumice from the claims. (*See* Exs. 1- 3, 13-17).

The government next argues that Plaintiffs' third (breach of contract) and fourth (duty of good faith) claims are barred under *res judicata* because they are based upon the 2002 Settlement Agreement at issue in *Cook II*. (*Motion*, p. 26). The doctrine of *res judicata* does not apply because the same "transactional facts" are *not* involved. As explained above, the motion to enforce the 2002 Settlement Agreement was filed in *Cook I*, Cause No. 94-344. *See* Motion to Dismiss, Ex. 11. The motion to enforce was not intended to be a new complaint. (*Id.*). The motion solely addressed whether the Forest Service's institution of a contest proceeding constituted a breach of the 2002 Settlement Agreement (*Id.*). Further, prior to the filing of the motion, the Forest Service had not sued Copar or otherwise claimed that it owned all pumice removed from the claims but not sold into the stonewash laundry industry, including the waste pumice and the 2"+ block pumice. (Ex. 1-3, 13-17) Indeed, those claims were not raised until the Forest Service issued the $8.7 million *Notice of Indebtedness* on June 16, 2009, which was

over one year after the motion to enforce was filed in *Cook II*.  Consequently, different facts and claims are involved.

The government argues that Plaintiffs' misrepresentation claims are barred by the doctrine of collateral estoppel by virtue of the judgment entered in the administrative appeal in *Bosworth*, 502 F. Supp. 2d 1210-11.  (*Motion*, p. 28.)  The doctrine of collateral estoppel differs from *res judicata* and requires as follows:

> Issue preclusion is appropriate only if:  (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action.

*In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994), *citing A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed. Cir. 1983).

Plaintiffs' misrepresentation claims are not barred by the *Bosworth* appeal because none of the elements of collateral estoppel are satisfied.  Plaintiffs identified the following representations as the basis of their claim in this case.

> The Forest Service agents represented to Copar that the end use of pumice was not material as to whether the pumice was locatable; that the pumice removed could be sold for any purpose; that the Forest Service would be "reasonable" in its regulation of the mining operation; that the mine was an "industrial operation" and that removal of some undersized pumice, rocks and dirt from the mine "was unavoidable;" that Copar could process the ¾"+ pumice for use in the laundry industry; that the transportation and processing of the pumice resulted in waste, sometimes as much as 40% of the pumice removed; that Copar's mining operations were in accordance with federal law and Forest Service regulations; that Copar could lawfully remove undersized pumice from the claims; that Copar could lawfully remove up to 10% of undersized pumice from the claims; that Copar could remove up to "substantial amounts" of undersized pumice from the claims in connection with its mining activities; and that up to 30% of the ¾"+ pumice removed from the deposit could be degraded or wasted during transportation and processing operations.

*Amended Complaint*, ¶ 24, and Exs. 3, 13-15, hereto documenting the foreign representations.

None of the representations were raised, actually litigated or essential to the final judgment entered in the administrative appeal in *Bosworth*. All that *Bosworth* actually determined was that the 2003 NON issued by the Forest Service was not arbitrary or capricious and was supported by substantial evidence under the APA standards. *See Bosworth*, 502 F. Supp. 2d at 1219. ("The inquiry here is whether the decision to issue the Notice is supported by the substantial evidence test under APA standards.") This inquiry did not involve the truthfulness of the various representations outlined above or Copar's reliance upon them is performing under the contract or Settlement Agreement with the government.

C.    **Plaintiffs' regulatory takings and unjust enrichment claims are actionable.**

In Point C, the government claims that Plaintiffs' regulatory takings and unjust enrichment claims fail because Copar has no right to the pumice at issue, so no property right was involved. (*Motion*, pp. 29-31.)

The government's argument fails. It is elementary that unpatented valid mining claims constitute a property interest which is protectable within the meaning of the Fifth Amendment of the United States Constitution. *See Cook v. U.S.*, 42 Fed. Cl. 788 (1999). The Court in *Freese* stated as follows:

> It is a matter beyond dispute that federal mining claims are "private property" enjoying the protection of the Fifth Amendment. Judge Finesilver of the federal district court has nicely summarized the applicable concepts:
> A mining claim is an interest in land which cannot be unreasonably or unfairly dissolved at the whim of the Interior Department. Once there is a valid discovery and proper location, a mining claim, in the language of the Supreme Court, is "real property in the highest sense." Legal title to the land remains in the United States, but the claimant enjoys a valid, equitable, possessory title, subject to taxation, transferable by deed or devise, and otherwise possessing the incidents of real property.

*Freese*, 639 F.2d at 757, *citing Oil Shale Corp. v. Morton*, 370 F.Supp. 108, 124 (D.Colo. 1973).

The government relies upon its self-serving interpretation of the 2002 Settlement Agreement and *Tidwell*, 603 F.3d at 793, for the proposition that the plaintiffs had no right to dispose of any pumice for common variety purposes or to sell the locatable 2"+ block pumice for biofilter uses. (*Motion*, p. 30). This is erroneous and misses the point. It is undisputed that the 2002 Settlement Agreement contains no provision which limited the sale or disposition of the 3/4"+ pumice or the block pumice solely to be laundry industry or prohibited the sale of the 3/4"+ pumice to common variety purposes. (*Complaint*, Ex. 1). The Forest Service itself has acknowledged the Agreement contains no such limitations and points to its regulations as the authority for its new-found restrictions upon end use of pumice. (Tafoya dep. p. 132, Ex 12). However, the Forest Service also acknowledges that the pumice could have been lawfully disposed of in an off-site landfill and that the 2"+ block pumice was locatable as a matter of law and could be removed and sold for any purpose requiring such a dimension. *See Linden* dep. p. 39, Ex. 13. The Forest Service never advanced a trespass/conversion claim based upon the unreasonable and capricious theory that it owned the pumice, that Copar converted pumice by selling it at nominal prices, and that Copar should never have removed and sold any of the locatable block pumice, in the first place.

As explained at length above, the Tenth Circuit's decision in *Tidwell* was an administrative appeal which affirmed the Forest Service's request for mine production and sales records. The decision did not hold, as the government now contends, that the plaintiffs had no right to sell or dispose of pumice for common variety uses or sell the block pumice for biofilter air pollution control purposes.

The government also contends that the misrepresentations by Forest Service officials cannot create a property interests. (*Motion*, pp. 30-31.) As explained above, the property

interest at stake arise under the U.S. mining laws, as previously explained and applied by this Court in *Cook I*, 42 Fed. Cl. 788. The misrepresentations at issue here pertain to the meaning and interpretation of the 2002 Settlement Agreement and the Forest Service regulations at issue. While the Forest Service has authority over the implementation of the regulations located at 36 C.F.R. 228.1, the implementation of that authority may also result in a breach of contract or unconstitutional taking. *Century Exploration New Orleans v. U.S.*, 103 Fed. Cl. 70, 76-78.

### D. The Amended Complaint states a breach of contract claim and breach of duty of good faith and fair dealing claim.

The government argues in Point D that the Amended Complaint fails to state claims for a breach of contact or breach of the duty of good faith and fair dealing. (*Motion*, pp. 31-33.) The government essentially argues that its conduct did not violate the 2002 Settlement Agreement because the Forest Service was merely enforcing its regulations. (*Motion*, p. 33.)

The government conveniently overlooks that it has entirely deprived Copar of its benefit of the bargain by virtue of its new oppressive, stringent and contradictory interpretations and application of its regulations. The government now prohibits and effectively criminalizes what were previously acceptable mining activities contemplated by the parties as part of the 2002 Settlement Agreement and under the Common Varieties Act and as further authorized the Forest Service. *See* 2/6/2006 NON and 5/16/2006 letter, Exs. 1,3).

The government's position is in derogation of several sound and well-established public policies and principles of interpretation of contracts. First, "there is a long-standing policy in the law in favor of settlements." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d 1323, 1333 (Fed. Cir. 2008). Further, there is a "'compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into' because enforcement of settlement agreements encourages parties to enter into them – thus fostering judicial economy." *Flex-Foot,*

*Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369 (Fed. Cir. 2001); *see also Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed. Cir. 1988) (-- holding that the enforcement of the literal terms of a settlement agreement is so important it trumped other policy considerations -- "settlement of litigation" is more strongly favored in the law.  Second, a settlement agreement is a contract, and is "construed in accordance with general contract principles."  *Maxey v. United States Postal Serv.,* 2003 WL 344346 at *2 (Fed. Cir.); *see also Tretchick v. Dep't of Transp.,* 109 F.3d 749, 752 (Fed. Cir. 1997).  As discussed in *Harris v. Dep't of Veterans Affairs,* 142 F.3d 1463, 1467 (Fed. Cir. 1998), the Court interprets settlement agreements as follows:

> [W]e first ascertain whether the agreement clearly states the understanding between the parties.  If there is an ambiguity in the formation of the agreement or during its performance, we implement the intent of the parties at the time the agreement was struck.  We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning.

*Id.*  Moreover, it is well-settled that the rules of construction are no different for interpreting contracts with the government:  the principles of general contract law apply, except where Congress has adopted a different standard.  *Fomby-Denson v. Dep't of the Army,* 247 F.3d 1366, 1373-74 (Fed. Cir. 2001) (collecting cases).  In interpreting a contract, a court is required to give meaning "to all parts of the contract," without rendering any provisions "insignificant or useless."  *Hills Materials Co. v. Rice,* 982 F.2d 514, 517 (Fed. Cir. 1992), *Restatement (Second) of Contracts*, § 203(a) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

The government's interpretation of the Agreement violates these rules because it allows the government to deprive Copar of its ability to retain and use the mining claims at issue.  This renders the express "retention" language of the 2002 Settlement Agreement totally meaningless.

It is elementary that general language in a contract cannot be used to contradict or destroy specific language in a contract. *Hills Materials Co.,* 982 F.2d at 517 (specific terms control over more general language); *Restatement, supra,* § 203(c) ("specific terms and exact terms are given greater weight than general language"); *Hol-gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 351 F.2d 972 (Ct. Cl. 1965). Therefore, the general language regarding "subject to all pertinent statutes and regulations" should not be used by the government to contradict or defeat the specific language which expressly authorizes the Cooks to *retain* the mining claims.

Moreover, as noted above, the term "pertinent statutes and regulations" as used in the 2002 Settlement Agreement is vague and ambiguous because it is susceptible to more than one meaning. *Hill Materials Co.*, 982 at 516. It is susceptible to more than one meaning because it is so indefinite that reasonable persons can differ as to which statutes and regulations are "pertinent," such as the Cooks and the government do here. It is inappropriate to grant a motion to dismiss where material contract terms are ambiguous. *Canal 66 P'ship d/b/a Doubletree Hotel v. United States*, --- Fed. Cl. ---, 2009 WL 2137132 (Fed. Cl.); *Beta Sys. Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir 1988).

Finally, all government contracts include an implied covenant of good faith and fair dealing. *Centex Corp. v. United States*, 49 Fed. Cl. 691 (2001). The obligation of good faith and fair dealing extends to the negotiation, performance, interpretation and the enforcement of contracts. (*Id.*); *Restatement*, § 205. Each party is entitled to receive the benefits of the contract and one party may not deprive the other of its benefits. *National Australia Bank v. United States*, 55 Fed. Cl. 782 (2003). In particular, the government may not use its power as the sovereign to eradicate the legitimate expectations of the other contracting party, as this would render the promises of the government illusory and meaningless. (*Id.*)

The Forest Service, by its latest oppressive regulatory tactics, is using its power as sovereign to deprive Plaintiffs of their benefits under the Agreement.  The government is plainly taking steps to appropriate the mining claims to itself in contradiction to its promise that the plaintiffs would retain the claims, which render the promise illusory and meaningless, and destroy their legitimate expectations that they would retain, operate and develop a mine upon the claims.

### E.        The Amended Complaint states an unjust enrichment claim.

In point E, the government argues that the Amended Complaint fails to allege sufficient facts to allege sufficient facts to state an unjust enrichment claim.  (*Motion*, pp. 33-35).  As the government recognizes, unjust enrichment exists when one party knowingly benefits at another's expense, and allowing that party to retain the benefit at another's expense and allowing that party to retain the benefit would be unjust."  *Romero v. Bank of the Sw.*, 2003-NMCA-124, 135 N.M. 1, 9, 83 P.3d 288, 296.

The Amended Complaint adequately states an unjust enrichment claim.  It alleges that the government was unjustly enriched in several ways.  The government was enriched by virtue of retaining substantial quantities of 3/4"+ pumice which Copar was entitled to have.  (*Am. Compl*. ¶¶ 65-66).  The government has appropriated this pumice and may use it for whatever purposes it chooses and have thereby been enriched by keeping the property, just as if it were other property belonging to the plaintiffs.  The Amended Complaint also alleges that the government has been or will be unjustly enriched by the assessment of substantial damages, fines and penalties against Plaintiffs under the guise of the Forest Service's regulatory authority.  (*Am. Compl*. ¶ 65).

The government's collection of damages are premised upon the removal of the 3/4"+ pumice under the 2002 settlement agreement.  The government simply uses its regulatory

authority to deprive Plaintiffs of their property.   Plaintiffs' unjust enrichment claim also incorporates by reference all of the facts set forth in paragraphs 1 through 63 of the Amended Complaint which further specifically describe the acts which constitute unjust enrichment, including the factual basis of the government damage claims against the plaintiffs.

The government urges that there has been no unjust enrichment here because its actions are analogous to those where a party lawfully enforces a contract.   (*Motion*, p. 35).   The government's analogy misses the point, because the government has admitted, and the district court has determined, that its regulatory trespass case does *not* arise out of the 2002 Settlement Agreement reached between the parties and that the terms of the agreement are not at issue.   Ex. 4, p. 10).   Consequently, the government's analogy fails.   This Court is the only court with jurisdiction to entertain claims arising under the settlement agreement.   The government may be unjustly enriched by virtue of its conduct which disregards or violates the terms of the 2002 Settlement Agreement.

**III.**   **Conclusion**

For the foregoing reasons, the motion to dismiss should be denied.


Dated:  June 12, 2013

COMEAU, MALDEGEN, TEMPLEMAN
   & INDALL, LLP


By_____/s/_____
            Joseph E. Manges
            P.O. Box 669
            Santa Fe, New Mexico 87504-0669
            T: 505/982-4611 / F: 505/988-2987
            jmanges@cmtisantafe.com
            Attorneys for Plaintiffs

# INDEX

FACTUAL BACKGROUND ..........................................................................................................1

ARGUMENT

I.    A.    Plaintiffs' claims are not barred by the statute of limitations ...................................4

        B.    Plaintiffs' claims are not barred under the JNRA ..................................................15

        C.    The Court has jurisdiction over the misrepresentation claims..............................16

II.    A.&B. Plaintiff's' claims are not barred under *res judicata* or collateral estoppel ...........18

        C.    Plaintiffs' regulatory takings and unjust enrichment claims are actionable ..........21

        D.    The Amended Complaint states a breach of contract claim and breach of duty of good faith and fair dealing claim.....................................................................23

        E.    The Amended Complaint states an unjust enrichment claim ...............................26

III.    Conclusion .............................................................................................................27

## CERTIFICATE OF SERVICE

I hereby certify that I did on June 12, 2013 cause true and correct copies of

_____ to be served by electronic service through the Court or by electronic mail

(*) on:

Dominika Tarczynska, Esq. *
United States Department of Justice
Natural Resources Section
P. O. Box 7611
Washington, D.C. 20044-7611

Andrew Smith, Esq.  *
U.S. Attorney's Office
Post Office Box 607
Albuquerque, New Mexico  87103-0607

Rachel Kathleen Bowen, Esq.
United States Department of Justice
601 D Street, NW, 3rd Floor
Washington, D.C. 20004
Rachel.bowen@usdoj.gov

Comeau, Maldegen, Templeman &
    Indall, LLP

By ____/s/_____
        Joseph E. Manges
        Post Office Box 669
        Santa Fe, NM  87504-0699
        (505) 982-4611

Attorneys for Plaintiffs Copar Pumice Company,
Inc. and Kelly Armstrong

K:\COOK-COPAR PUMICE_1012-10\Pleadings\Ct Federal Claims 12-894\Copar's Response to U.S.'s Motion to Dismiss Ps' Complaint 06-12-13.v1.docx